

FILED

2020 Dec-03  PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNDER SEAL | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No: _____ |
| | ) | |
| UNDER SEAL | ) | **FILED UNDER SEAL** |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| Defendants. | ) | |
| | ) | **DEMAND FOR JURY** |

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. KATHLEEN CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: _____ |
| | ) | |
| VICTOR MENDOZA;<br>DARK SIDE MEDICAL, LLC;<br>VULCAN PAIN MANAGEMENT. | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| Defendants. | ) | |
| | ) | **DEMAND FOR JURY** |

### *QUI TAM* COMPLAINT

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA" or the "False Claims Act"), Relator Kathleen Carr, on behalf of herself and the United States of America, alleges and claims against Victor Mendoza, M.D., and Dark Side Medical, LLC, collectively doing business as Vulcan Pain Management ("Defendants"), as follows:

### JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.  Jurisdiction is also authorized under 31 U.S.C. §3732(a).

2

2.     Venue lies in this judicial district pursuant to 31 U.S.C. §3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial District, and can be found here.  Furthermore, Defendants committed within this judicial District acts proscribed by 31 U.S.C. §3729, to-wit: Defendants have, on an ongoing basis, systematically defrauded the United States by submitting false claims for payment to the Medicare program for spinal Facet injection services that were medically unnecessary and potentially harmful, were "up-coded," or were never performed at all and Defendants submitted false claims for medically unnecessary, up-coded, evaluation and management visits.

### PARTIES

3.     Defendant Mendoza is a physician who purports to offer pain management services through his business "Vulcan Pain Management," with offices in Montgomery and Birmingham, Alabama.

4.     Defendant Dark Side Medical is a limited liability company incorporated by Mendoza, through which he operates Defendant Vulcan Pain Management.  Collectively, Defendants have falsely billed the United States for thousands of spinal facet injection procedures that were not reasonable or medically necessary and were not reimbursable, did not actually constitute a spinal facet injection for purposes of reimbursement, or both.

5.     Relator Kathleen Carr worked as Practice Administrator and Billing Coordinator at Vulcan Pain Management from the practice's inception in 2012 until December 2018. In this position, Relator Carr personally oversaw Defendants' practice and billing operations, including personally identifying illegal and improper billings. In response to Relator Carr's efforts to prevent false claims from being submitted, Defendant Mendoza terminated Relator Carr in violation of 31 U.S.C. 3730(h) in December 2018. Over the course of her employment, she learned that Defendants do not operate a legitimate pain management practice, but instead take advantage of vulnerable patients through the provision of multiple, repeated, unnecessary injections that are designed solely to profit Defendants.

6.     Prior to filing this Complaint, Relator voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3730(e)(4)(A), Relator is the original source of the information for purposes of that Section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in her possession and upon which her claims are based.

## THE FALSE CLAIMS ACT

7.      The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

8.      Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

9.     The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2).

10.    The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

11.    Additionally, the FCA provides relief from retaliatory actions -- (1) In general.-- Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment

because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter. 31 U.S.C. § 3730(h)

## MEDICARE REIMBURSEMENTS AND REQUIREMENTS

12.     The Medicare Program is established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, and provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

13.     Under Medicare "Part B," CMS covers physician and qualified non-physician practitioner (NPP) services and outpatient care. Medicare Part B helps pay for these covered services and supplies when they are medically necessary. Medicare Part B provides federal government funds to help pay for, among other things, certain visits provided by health care providers to Medicare beneficiaries

14.     To enroll as Medicare providers, Defendant Mendoza and Defendant Darkside Medical were required to submit a Medicare Enrollment Application. *See* CMS Form 855I(for individual providers such as Defendant Mendoza); CMS Form 855B(for medical practices and clinics such as Darkside Medical). In submitting both Form 855I and 855B, Defendants made the following "Certification Statement" to CMS:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855I.

15.    Since 1992, Medicare has reimbursed physicians for most types of care provided to Medicare beneficiaries using the Medicare Physicians Fee Schedule. *See* 42 U.S.C. § 1395w–4. Through the Physicians Fee Schedule, Medicare sets a standard reimbursement rate for nearly any type of service that a physician or a non-physician practitioner might provide, tied to the typical time and expense required to provide such service. *See* 42 C.F.R. § 414.20-22; MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12, *Physicians and Non-Physician Practitioners*, § 30.6; § 120.[1]

16.    In order to claim reimbursement from Medicare, physicians, NPPs and medical practices must submit CMS Form 1500, a standard claim form. *See* CMS Form 1500. The provider must describe the type of service provided using CMS's Healthcare Common Procedure Coding System (HCPCS), which is based closely on the American Medical Association's Current Procedural Terminology (CPT) codes. *See* 42 C.F.R. § 414.2; MEDICARE CLAIMS PROCESSING MANUAL at §

---

[1] Available at: http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf

30.6.   Each time Defendants submitted a claim to the United States through the FI, Defendants certified that the claim was true, correct, and complete, and that it had complied with all Medicare laws and regulations, including but not limited to those cited above. *See* CMS Form 1500.

17.     CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MACs). 42 U.S.C. § 1395kk-1.  Through these contracts, MACs perform the following functions, among others, in the administration of the Medicare program: determination of payment amounts, making payment, and reviewing the activities of medical providers, including medical utilization and fraud review. 42 U.S.C. § 1395kk-1; 42 U.S.C. § 1395ddd.  MACs are authorized by federal statute to issue Local Coverage Determinations (LCDs) "respecting whether or not a particular item or service is covered" by Medicare.  42 U.S.C. § 1395ff(f)(2)(B).

18.     Facet joints are paired diathrodial articulations of adjacent vertebrae – or the joint at which adjacent vertebrae connect and facet joint injection techniques are used in the diagnosis and and/or treatment of chronic neck and back pain.

19.     Prior to February 26, 2018, Cahaba GBA was the MAC responsible for administering the Medicare Part B Program in Alabama.  Cahaba GBA issued LCD L34293 Lumbar Facet Blockade, which governed reimbursement requirements for spinal facet injections (the "Cahaba LCD") and false claims

submitted by Defendants prior to February 26, 2018. Specifically, the Cahaba LCD requires demonstration that Facet injections are effective for that specific patient. Additionally, the Cahaba LCD provides as a "limitation of coverage" that "injections into the paravertebral musculature must not be billed as [Intra-Articulate injections] or [Dual Medial Branch Block] Injections.

20. As of February 26, 2018, Palmetto GBA became the MAC responsible for administering the Medicare Part B Program in Alabama. MAC Palmetto GBA issued LCD L3647, titled: Facet Joint Injections, Medial Branch Blocks, and Facet Joint Radiofrequency Neurotomy, setting out reimbursement requirements for spinal facet injections (the "Palmetto LCD"), which governed Defendants' claims after February 26, 2018.

21. Making clear, as an initial matter, that facet injections are of dubious clinical value and may be associated with "severe adverse side effects," the Palmetto LCD contains four threshold, primary requirements: (1) the patient must have a history of at least 3 months of moderate to severe pain; (2) the pain is inadequately responsive to conservative care, such as physical therapy or the administration of non-steroidal anti-inflammatory drugs; (3) there is no non-facet pathology that could explain the source of the patient's pain (such as fracture or tumor), and (4) Clinical assessment implicates the facet joint as the putative source of pain. Moreover, the LCD provides specific limitations on the volume of

injections that will be covered: specifically, a maximum of five injections in the cervical/thorasic spine and five in the lumbar spine per 12 months. Finally, the LCD provides that these repeated injections are only medically necessary and payable if the injection results in a reduction in "significant pain relief (>50%) for at least three months."

## DEFENDANTS' FRAUDULENT SCHEMES

22.     Defendants routinely billed Medicare for spinal facet injection procedures that were unreasonable and medically unnecessary or were "upcoded" and were not actually facet joint injections.

23.     Defendants identified facet injections as a potential money-maker, in contrast to the prescription of opioid drugs for back pain, which is more highly scrutinized by insurers and less profitable for the medical provider. Accordingly, Defendants required patients to undergo spinal facet injection as a precondition to receiving prescriptions for the drugs that many of them were accustomed or addicted to taking. As a result of this unsavory practice, many of Defendants' patients received facet injections that were not medically indicated, often in high volumes.

24.     Moreover, many if not all of the injection procedures performed by Defendants did not actually qualify as facet injections, and were in fact "trigger point" injections. In contravention of Medicare billing requirements, Defendants

falsely billed these unnecessary and non-qualifying procedures under the CPT codes for spinal facet injections.

25.    The treatment and diagnosis of chronic pain may at times require interventional procedures involving injections into muscles and tendons, or into joints such as the spine (facet joints), knees, hips, elbows, or shoulders.

26.    A medical provider with proper training can administer these injections to diagnose or treat pain by using an anesthetic to block nerve signals, sometimes called a nerve block, or by decreasing inflammation through use of a steroid in the injection. Many times these interventions involve using a combination of both approaches.

27.    Facet joints are joints in the spine that aid stability and allow the spine to bend and twist.   Facet joint injections are a type of interventional pain management technique used to diagnose or treat axial back pain, which is a band-like pain in the back or neck. Physicians typically perform facet joint injections using radiological guidance to ensure correct needle placement and avoid nerve or other injury.

28.    Determining whether a patient is a candidate for an injection, and, if so, what type of injection is clinically appropriate, depends upon the patient's clinical    presentation    after    a    musculoskeletal    and    neurological    physical

examination, combined at times with a review of diagnostic imaging such as an x-ray.

29.     The clinical presentation of a patient is key to determining the mode and method of an interventional procedure.  An abnormal diagnostic image alone is not determinative of necessity for interventional pain procedure. The majority of asymptomatic older adults have degenerative changes seen in imaging of the spine. Furthermore, even in patients who have pain, the pain may be coming from only one of numerous radiographically abnormal structures in the spine, and it may not be a structure amenable to treatment by injection.  Since these injection procedures only serve to alleviate symptoms, they are not reasonable and necessary in patients without symptoms or in patients with symptoms caused by an anatomic structure other than the target of the treatment with an injection – hence the restrictions set forth in the Palmetto LCD.

30.     As the Palmetto LCD also notes, the drugs used in facet injections may cause adverse events. For instance, the frequent injection of steroids into a joint or muscle could lead to weakening or necrosis of the area injected, nerve damage, or infection.

31.     Accordingly, a clinical assessment must implicate the specific facet joint whose therapeutic target is the injection as the putative source of pain, and

pre-procedural documentation must include a complete initial evaluation including an appropriately focused musculoskeletal and neurological physical examination.

32.     Among other requirements for Medicare payment, and expressly contained in the reimbursement requirements of the Palmetto LCD, a patient must have a history of at least 3 months of moderate to severe pain with functional impairment that has not been adequately responsive to more conservative care.

33.     With little regard to patient care or these Medicare billing requirements, Defendants routinely performed and billed for repeated, unnecessary facet injections (which were often trigger point injections that they falsely billed as facet injections).

**A.    Defendants billed for facet injections performed on patients who plainly did not meet medical necessity requirements for facet injection procedures, including patients whose pain had not persisted for three months, had not first been treated through conservative methods, or had not improved after the previous injections.**

34.     Simply put, it was Defendants' practice to perform high volumes of facet injections on any patient who would submit to them, often overcoming patient reluctance or using opioid prescriptions as a *quid pro quo.*    In 2015, Relator Carr performed a chart audit to determine whether Defendants' patient charts contained information justifying medical necessity, such as (Medicare-mandated) improvement following repeated injections.    She found that Defendants' documentation was woefully deficient, did not justify services were

medically necessary and did not comport with CMS requirements.  When Relator attempted to stem the tide of Defendants' false claims and confronted Defendant Mendoza with the results of her audit, he threw the folder at her head.

35.    Further, Defendant Mendoza routinely instructed his office staff and clinical staff, including Relator and Vulcan employee Stephanie Vescue to falsely document that patients were improving so Defendants could falsely claim patients met certain prior authorization requirements for pain management injections. Specifically, Defendant Mendoza instructed Ms. Vescue to falsely document that patients experienced 50% pain improvement from their previous injections—when no such improvement had been made.  This scheme was specifically employed to falsely meet Medicare Advantage Plan Viva Medicare's prior authorization requirements for pain management injections.  Although Ms. Vescue confided to Relator Carr that she felt uncomfortable making these false statements, she did falsify patient improvement and therefore Defendants caused to be submitted and submitted false claims to Viva Medicare through this scheme.

**B.    Defendants regularly performed an impermissible and improper volume of injections.**

36.    Defendants typically performed as many injections on each patient as Mendoza thought they could possibly get away with billing.  Nearly every patient received bilateral injections in all three spinal regions (lumbar, thoracic, cervical).

In Relator's experience, Defendants performed bilateral injections on all three regions of the spine for nearly every patient – in total, nine to twelve injections, per-patient, every month.  Plainly, this protocol was not tailored to the medical needs of the specific patient and was instead directly tied to Defendants' profitability.

37.    The egregious billing of improper, impermissible and medically unnecessary injections for Medicare Patient L.B. is representative of Defendants fraud.  For Patient L.B., Defendants billed Medicare for 22 sessions of injections over a period of 28 months from September 19, 2014 to January 18, 2017 for patient L.B.  These injections were medically unnecessary and improper.  Claims for such injections were false because the documentation did not support a failure of conservative therapy and the documentation did not support that the facet joint injections were effective in relieving the patient's pain or improving her functional status.  Specifically, Defendants submitted claims for three bilateral facet block injections to Alabama Medicare purportedly provided to Patient L.B. on January 18, 2017.  These injections were reported as performed at Bilateral L3-4, Bilateral L4-5 and Bilateral L5-S1 and billed to Medicare on February 22, 2017 under CPT codes 64493 (with modifier 50), 64494 (with modifier 50) and 64495 (with modifier 50).  In addition, Defendant Darkside Medical, LLC billed E/M code 99213 with an improper modifier 25 billing as well as three separate CPT codes for

various compounds used in the injections. Specifically, Defendants billed Medicare for compound clonidine hydrochloride under code J0735, provided to Patient L.B.[2] In total, the submitted value of the false claims billed on February 22, 2017 was $1,290.

### C. Defendants billed for facet injections when, in fact, Defendant Mendoza had performed an epidural or trigger point injection.

38.     As part of her compliance efforts, Relator Carr in early 2018 coordinated with Amy Turner of CE Medical Group, an outside compliance consultant who performed a chart audit of Defendant Mendoza's patients. The auditor determined that, based on Defendant Mendoza's own notes, the procedures that Defendants had billed as facet injections in fact constituted "trigger point" injections. Rather than truly involving an injection of medicine into the patient's spinal facet joint, Defendant Mendoza had performed trigger point injection into the patients' musculature. This type of injection is billed under a separate CPT Code (20553) from facet injections (CPT codes 64490-64495) and carries a significantly smaller reimbursement. Specifically, Defendant Mendoza's typical treatment of Facet Injections would result in approximately $500 in reimbursement

---

[2] Defendants universally provided and billed for clonidine hydrochloride in conjunction with injections, despite significant adverse impacts on patients, because Defendant Mendoza determined that Medicare would reimburse Defendants $50 for each injection.

from Medicare and $400 in reimbursement from Medicaid, a true billing of trigger point injections would provide a reimbursement of at most $50.

39.     Specifically, for Patient R.B., Defendants billed Medicare Advantage Plan United Healthcare Community Plan for three sets of Facet injections purportedly performed at Bilateral levels T9-10, T10-11, T11-12 under CPT codes 64490, 64491, and 64492 for a total amount of $975 on May 3, 2018. However, these claims were wholly false because these injections were determined to have not actually entered the Facet joint. Instead, by merely injecting medication into Patient R.B.'s musculature, Defendants actually provided trigger-point injections, which should have been billed under CPT code 20553 and would have been reimbursed at approximately $50-$60.

40.     Again, when confronted with the fact that he had falsely billed Medicare and Medicaid for thousands of procedures, Defendant Mendoza responded that he would simply (and fraudulently) alter the patient notes to create the false appearance that Defendants had billed correctly.

**D.    Defendants improperly double-billed Medicare for "evaluation and management" services that were in fact already included in the reimbursement for the injection.**

41.     Defendants almost invariably, and fraudulently, billed Medicare and Medicaid for physician evaluation and management services ("E/M services") performed on the same visit as facet injections. These claims were false, because

Defendants performed no services outside of what is included in the reimbursement for the injections. Effectively, for nearly every patient visit, Defendants billed the United States twice for the same work.

42.    The CPT coding system provides for five basic levels of E/M services performed in the physician office setting. In general, patients who present with more complex, acute, or critical conditions require more labor, effort, and expense to treat and those encounters are therefore reimbursed at a higher rate. The CPT codes are intended to categorize patient encounters based on the level of effort necessitated by the patient's condition. For a code and bill to be appropriate, the physician must have expended the associated labor and effort in caring for the patient, that level of effort must actually have been medically necessary and must be documented in the patient's documentation.

43.    Naturally, the CPT Codes and reimbursements associated with facet injections include the effort and expense incurred by the physician in preparing the patient for the injection and monitoring the patient during and after the injection procedure. Particularly where, as here, a physician is performing treatments such as facet injections on patients who are returning for "repeat visits" month after month, the physician cannot bill for extensive E/M services for the same visit as the injection unless the physician has performed E/M services above and outside the work necessary to perform the injection itself. Defendants, however, routinely

and regularly billed Medicare and Medicaid for what amounted to a full office visit on top of the facet injection when, in reality, all Defendants had done was perform the injections.  This constitutes fraudulent double billing.

44.     For example, for Patient L.B., Defendants billed E/M CPT code 99213 with modifier 25 to indicate a significant, separately identifiable evaluation management service on January 18, 2017.  Upon review of Patient L.B.'s medical record, a visit note dated September 14, 2010 demonstrates that Patient L.B. was seen by Defendant Mendoza for the same complaint of back pain for over six years and that with few exceptions, Defendants billed for monthly E/M Services from 2013-2017.  Further, most of the visit notes from these monthly visits were simply copied and pasted from one visit to the next and the only identifiable services was providing refills of Patient L.B.'s hydrocodone and methadone prescriptions (which Patient L.B. had been taking since at least 2010).  However, providing refill prescriptions for longstanding medications is not a significant or separately identifiable E/M service.

45.     Similarly, for Patient C.G., Defendants billed Medicare for an E/M service of August 11, 2016 under Code 99214 – which is the second highest level established patient E/M code.  However, this E/M visit was deficient because there were no recorded observations related to Defendant Mendoza's examination Patient C.G.

**E.      Defendants' Retaliatory Actions Against Relator**

46.      Throughout Relator's employment with Defendant Vulcan Pain
Management, Relator attempted to steer Defendant Mendoza toward compliance
and prevent Defendants' fraud.    For these efforts, Relator was harassed,
discriminated against, demoted and ultimately terminated from her employment in
violation of 31 U.S.C. § 3730(h).

47.      Specifically, Relator Carr attempted to educate Defendant Mendoza
on Medicare Billing Requirements by highlighting certain claims where Defendant
Mendoza's documentation was deficient and why these claims did not meet
Medicare conditions of payment.    On April 17, 2018, Relator Carr provided
Defendant Mendoza numerous comments identifying deficiencies in Defendant
Mendoza's documentation related to an encounter that was billed under CPT code
99204 with Patient P.H., who is insured by Medicare.    In response to this
legitimate attempt at compliance, Defendant Mendoza was angry and hostile
toward Relator.

48.      Similarly, on or around March 8, 2018, Relator Carr provided
Defendant Mendoza with a highlighted copy of the Cahaba LCD that specifically
highlighted portions of the LCD that Defendant Mendoza routinely, and
knowingly, overlooked when providing, documenting and billing for Facet
Injections.  Specifically, Relator Carr informed Defendant Mendoza that a patient

must demonstrate specific pain relief for a minimum of six (6) weeks of 50% with the continued ability to perform previously painful maneuvers for additional Facet Injections to be considered medically necessary.

49.    Relator Carr also specifically informed Defendant Mendoza of the limitations of Facet Injections including that care for the patient with chronic lower back pain must include a multi-disciplinary approach and Facet Injections for acute pain (defined as less than three months duration) is not reasonable or necessary. Because Defendant Mendoza routinely flaunted both of these medical necessity limitations, Relator Carr identified these limitations in an attempt to demonstrate precisely how Defendant Mendoza's Facet Injections were not reasonable and medically necessary and therefore false claims.  Defendant Mendoza was resentful, angry and dismissive to Relator's attempts to demonstrate his lack of billing compliance.

50.    In an another attempt to prevent Defendant Mendoza from billing for up-coded and medically unnecessary E/M visits, Relator Carr provided Defendant Mendoza with a printed out PowerPoint presentation from a American Medical Billing Association (AMBA) presentation that Relator Carr attended on or around March 13, 2018.  This presentation identified precisely how E/M code 99214 should be billed.  Relator Carr provided this information to Defendant Mendoza to

specifically educate him in hopes he would cease Defendants' false billing for up-coded and medically unnecessary E/M codes.

51.   Finally, after Defendant Mendoza repeatedly disregarded Relator Carr's efforts to inform him of billing compliance and remedy his false claims, Relator Carr brought in Amy Turner, Director of CE Medical Group, who is an outside consultant and pain management billing expert to attempt to educate Defendant Mendoza that his fraudulent billing practices were extremely problematic.  However, Defendant Mendoza also rejected Ms. Turner's advice.

52.   As addressed *supra,* upon a review of Defendant Mendoza's charts in May 2018, Ms. Turner identified that the procedures that Defendants billed as facet injections in fact constituted much lower reimbursing "trigger point" injections.

53.    When faced with the knowledge that Defendants would have to self-report thousands of miscoded and false claims, Defendant Mendoza stated he would just alter the patient notes to cover up his false claims and responsibility to refund Medicare for these false claims.

54.   Relator Carr pleaded with Defendant Mendoza to self-report the claims, stating that his plan to simply alter procedure notes would not even be effective in avoiding scrutiny because he is required to provide photos with Facet Injection claims and CMS or MAC auditors would be able to discern from the

procedure photos that the procedure was actually a trigger-point injection and not an intra-articulate Facet injection.

55.     To this, Defendant Mendoza simply stated auditors could not discern whether injections were actually intra-articulate Facet injections simply from the procedure photos.    Therefore, Defendant Mendoza believed he would not be caught and refused to self-report and refund Medicare.

56.     After this series of events, spanning March to May 2018, Defendant Mendoza's retaliatory and discriminatory treatment of Relator Carr escalated. Relator Carr was first demoted from Practice Manager in June 2018, treated cruelly and routinely harassed by Defendant Mendoza.    Then, Defendant Mendoza "terminated" Relator Carr on August 1, 2018 with an intentionally delayed and retaliatory separation date of December 31, 2018, in direct retaliation for Relator Carr's efforts to prevent false claims from being submitted in violation 31 U.S.C. 3730(h).

**COUNT ONE**
**PRESENTING OR CAUSING TO BE PRESENTED**
**FALSE CLAIMS UNDER 31 U.S.C. §3729(a)(1)(A)**

57.     Relator adopts and incorporates paragraphs 1-56 as though fully set forth herein.

58.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

> a.   Defendants submitted false claims for facet injection procedures that were not medically necessary;
>
> b.   Defendants submitted false, "up-coded," claims for facet injection procedures when, in fact, Defendants performed trigger-point injections;
>
> c.   Defendants submitted false claims for physician evaluation and management services that were medically unnecessary, up-coded or never performed;

59.   The United States paid the false claims described herein and summarized in the previous paragraph.

60.   Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR
## RECORDS MATERIAL TO A FALSE CLAIM
## UNDER 31 U.S.C. §3729(a)(1)(B)

61.     Relator adopts and incorporates paragraphs 1-56 as though fully set forth herein.

62.     By and through the fraudulent schemes described herein, Defendants knowingly - by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.     Defendants made and used false records reflecting facet injection procedures that were medically necessary, did not qualify as facet injection procedures, or both;

b.     Defendants made and used false records reflecting physician evaluation and management services that were medically unnecessary, up-coded or never performed;

c.     Defendants made and used false CMS Forms 1500 and 855I and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendants intended to – and did – defraud the Medicare system by submitting false claims for facet injection procedures and evaluation and management services. The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States.

63.     In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

64.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. §3729(a)(1)(G)

65.     Relator adopts and incorporates paragraphs 1-56 as though fully set forth herein.

66.     By and through the fraudulent schemes described herein, Defendants knowingly by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or

knowingly and improperly avoided an obligation to pay or transmit money or

property to the United States, to wit:

> a.    Defendants knew that they had received reimbursements for facet
> injection procedures that were not medically unnecessary, up-coded or
> were not performed, yet Defendants took no action to satisfy their
> obligations to the United States to repay or refund those payments and
> instead retained the funds and continued to falsely bill the United
> States;

> b.    Defendants knew that they had received reimbursements for
> physician evaluation and management services that were medically
> unnecessary, up-coded or never performed, yet Defendants took no
> action to satisfy their obligations to the United States to repay or
> refund those payments and instead retained the funds and continued to
> falsely bill the United States;

67.    As a result of Defendants' fraudulent conduct, the United States has

suffered damage in the amount of funds that belong to the United States but are

improperly retained by Defendants.

WHEREFORE, Relator demands judgment in her favor on behalf of the

United States, and against Defendants, in an amount equal to treble the damages

sustained by reason of Defendants' conduct, together with civil penalties as

permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different,

or further relief to which Relator may be entitled.

## COUNT FOUR
## RETALIATION UNDER 31 U.S.C. §3730(h)(1)

68.     Relator adopts and incorporates paragraphs 1-56 as though fully set forth herein.

69.     Defendant knowingly threatened, harassed, discriminated against, and discharged Relator because of lawful acts done by Relator in efforts to stop or prevent violations of the False Claims Act.

70.     As a result of Defendants' retaliatory conduct, Relator has suffered damages of extended periods of lost pay, irreparable harm to her personal and professional reputation, undue hardship forced upon Relator and her family, and extended infliction of emotional distress upon Relator and her family.

WHEREFORE, Relator demands judgment in her favor and against Defendants, in an amount of two times the amount of back-pay accrued since Relator's termination, interest on that back-pay, and compensation for special damages caused by Defendants' discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).


Respectfully submitted,


JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
Attorneys for Relators
FROHSIN BARGER & WALTHALL

100 Main Street
Saint Simons Island, Georgia 31522
Tel:      205.933.4006
Fax:      205.933.4008
Email: jim@frohsinbarger.com
           elliott@frohsinbarger.com
           ben@frohsinbarger.com

Attorneys for Relator


OF COUNSEL
FROHSIN BARGER & WALTHALL
James F. Barger Jr.
J. Elliott Walthall
Benjamin P. Bucy
Frohsin Barger & Walthall
100 Main St.
Saint Simons Island, GA 31522
205.933.4006

## RELATOR DEMANDS A TRIAL BY STRUCK JURY

## CERTIFICATE OF SERVICE

On or before the ___11th___ day of December, 2020, Relator hereby certifies

that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of

the *Qui Tam* Complaint has been executed as follows:

By Certified Mail to:
United States Attorney for the Northern District of Alabama
Attn: Assistant United States Attorney Clinton Richardson
801 4th Avenue North
Birmingham, Alabama 35203


By Certified Mail to:
Attorney General of the United States
U.S. Department of Justice
Attn: Civil Frauds Division
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001




Of Counsel

31